# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## NIHAL MICHAEL GAUTAM,
**Plaintiff,**

**v.**

## CITY OF SUNRISE, et al.,
**Defendants.**

**Case No. 25-cv-60841**

FILED BY_____D.C.

MAY 2 3 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

Gautam v. City of Sunrise                     Civil Rights Complaint

1. IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.: 0:25-cv-60841-JMS
Judge: Hon. Jared M. Strauss

2. NIHAL MICHAEL GAUTAM,
Plaintiff,

3. v.

4. CITY OF SUNRISE, FLORIDA;
CHIEF ANTHONY ROSA (individually and in his official capacity);
LT. MICHAEL WEST (retired, Pension Board Chair);
SGT. CHRISTOPHER PULLEASE (retired);
OFFICER MAURICE LAWRENCE;
OFFICER CARLOS LOPEZ;
OFFICER TERRELL BUSH;
OFFICER DELTAMUS CASON;
SGT. BRADFORD JONES ("Ghost" Supervisor, BWC-identified, not listed in any paperwork);
DEPUTY CHIEF SEAN VISNERS;
MAJOR BROOKE LEBEL;
SGT. RICHARD WHITE;
FELICIA M. BRAVO (in her official capacity);
JOHN DOE OFFICERS 1–10,
Defendants.

5. SECOND AMENDED COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, DECLARATORY RELIEF, AND STRUCTURAL REFORM
[JURY TRIAL DEMANDED]

6. DEDICATION IN HONOR OF KEVIN DESIR
This action is respectfully dedicated to Kevin Desir, whose profound impact, unwavering loyalty, and tragic death fuel this quest for justice. Kevin's spirit and legacy compel this litigation, seeking systemic change and accountability.

7. TRIBUTE AND OPENING STATEMENT
This lawsuit is dedicated to protecting the innocent, revealing hidden corruption, and honoring those silenced by institutional abuses—most notably Kevin Desir, and all officers who bravely resist corruption from within.

8. I. INTRODUCTION
This Complaint exposes deep-rooted corruption within the Sunrise Police Department, highlighting systemic pension fraud, ghost officer deployment, intentional evidence suppression,

Gautam v. City of Sunrise          Civil Rights Complaint

and egregious violations of civil rights. Plaintiff demands justice, transparency, structural reforms, and accountability for extensive harm inflicted.

**9. II. JURISDICTION AND VENUE**

**Jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367; venue proper under 28 U.S.C. § 1391(b).**

10. III. PARTIES

Detailed previously.

11. (A), which details your false arrest, inhumane detention, and disregard for your family on March 6, 2025. We'll cover this comprehensively here, then continue with each subsequent section methodically. You can copy this directly into your document under subsection IV (A):

12. A. False Arrest, Inhumane Detention, and Disregard for Family – March 6, 2025

13. On March 6, 2025, at approximately 2:00 AM, Plaintiff arrived at his son's mother's residence for the purpose of peacefully discussing child-related matters. Plaintiff was completely unarmed, calm, and accompanied only by his two trained golden retrievers. At this time, multiple officers—Officers Maurice Lawrence, Carlos Lopez, Terrell Bush, Deltamus Cason, Lt. Michael West, Officer Rachel Howe, and ghost supervisor Sgt. Bradford Jones—arrived at the scene with an aggressive and disproportionate display of force, deploying at least five vehicles including both marked patrol units and unmarked "ghost" units.

14. Plaintiff's one-year-old child, Leo, was inside the residence, asleep and unaware of the situation unfolding outside. Despite the presence of a minor, officers showed no concern for Leo's safety, emotional stability, or psychological well-being. Throughout the extended detainment process, no efforts were made to provide comfort or to ensure the child's well-being. Officers frequently entered and exited the residence without clear cause, repeatedly questioning the alleged victim—Leo's mother—and exposing the sleeping child to potential distress and instability.

15. At approximately 3:00 AM, Plaintiff was handcuffed behind his back by Officer Maurice Lawrence. Plaintiff immediately expressed intense discomfort, stating clearly on body-worn camera (BWC) footage, "These cuffs are too tight, please loosen them," and "I can't feel my hands." These pleas were recorded yet deliberately ignored or dismissed by the attending officers, including Lawrence, Bush, Lopez, and West.

16. Plaintiff was placed in a patrol car at precisely 3:03 AM and locked inside. Over the next forty-six minutes, Plaintiff's repeated requests for basic human necessities such as water and restroom access were deliberately ignored. Officers Lawrence, West, Bush, and ghost supervisor Jones can be clearly heard and seen on body camera footage openly mocking Plaintiff's pleas and deliberately discussing potential exaggerated charges outside the vehicle. Plaintiff repeatedly

Gautam v. City of Sunrise                     Civil Rights Complaint

begged for relief and was audibly distressed—yet officers responded with ridicule, sarcasm, or complete indifference.

17. Critically, body-worn camera footage reveals repeated instances of deliberate muting by officers Lawrence, Bush, and West, particularly when sensitive or incriminating conversations about Plaintiff's arrest and charges occurred. The muting patterns align precisely with instances where officers were conferring about Plaintiff's legal status, property management, and the narrative to justify continued detainment. This strategic use of muting demonstrates an intentional effort to conceal their unlawful conduct, including suppression of exculpatory evidence and constitutional violations.

18. During this unlawful detention, officers Carlos Lopez and Terrell Bush assumed control of Plaintiff's personal property, including his two dogs, without providing any documentation or property receipts. Plaintiff repeatedly asked officers, "Where are my dogs? Are they safe?" Officers responded dismissively or sarcastically, refusing to provide a clear answer or confirm the safety and custody of Plaintiff's animals.

19. The officers involved, particularly Officer Lopez, openly questioned the legitimacy of the arrest on body camera footage. At one point, Lopez stated explicitly to Officer Bush, "That's lowkey some weak-ass PC," indicating significant internal doubts regarding the validity and legality of Plaintiff's arrest. Yet, officers proceeded without intervention or corrective action.

20. Moreover, multiple critical supervisory officers, notably Lt. Michael West and ghost supervisor Sgt. Bradford Jones, were observed on numerous BWC videos clearly directing and overseeing the operation, yet their names are conspicuously omitted from all official documentation including CAD logs and arrest reports. Sgt. Jones, despite clear visual evidence placing him at the center of the operational command, was never officially documented or named in subsequent discovery or official reports—a deliberate omission constituting intentional record falsification.

21. Officers also failed entirely to read Plaintiff his Miranda rights, as clearly required by law, despite placing him under formal arrest and detainment. Plaintiff was neither informed clearly of his charges nor afforded his constitutional right to counsel or informed legal representation during this extended detention.

22. These actions resulted not only in substantial emotional and psychological distress for Plaintiff but also significant material harm. Plaintiff's professional reputation and personal stability were severely impacted, as later confirmed by documented loss of critical business relationships with major insurance carriers including Cigna and UnitedHealthcare.

23. Ultimately, this prolonged and unlawful detention, characterized by deliberate indifference, mocking cruelty, and egregious civil rights violations, underscores the systemic culture of abuse and impunity within the Sunrise Police Department. Plaintiff was subjected to conditions reminiscent of those preceding the tragic and preventable death of Kevin Desir, who

Gautam v. City of Sunrise          Civil Rights Complaint

similarly suffered inhumane neglect under the custody of Broward County authorities. Plaintiff's experience serves as a chilling reminder of an institutionalized disregard for basic human rights, due process, and constitutional safeguards within Florida's policing and detention frameworks.

24. B. Suppression, Tampering, and Evidence Destruction

25. The events of March 6, 2025, were not simply the result of officer negligence—they were the product of an orchestrated scheme to suppress evidence, manipulate the digital record, and conceal unlawful command structure through the strategic use of muting, redactions, omissions, and digital forensics.

26. Multiple high-ranking officers, including Lt. Michael West and Sgt. Deltamus Cason—both of whom were either officially retired or unlisted in arrest documentation—appear across numerous body-worn camera (BWC) files directing the arrest and post-custody actions. Despite their visible presence and active participation, they were omitted from CAD logs, arrest reports, and discovery materials produced to Plaintiff and his defense counsel.

27. Plaintiff has identified no fewer than 12 deliberate muting events across the BWC recordings of Officers Lawrence, Bush, West, and others. These mutings occur at precise moments: when officers are discussing what to charge Plaintiff with, when West confers with Cason, when Jones steps up to supervise the arrest without identification, and when Plaintiff pleads for assistance. These are not isolated malfunctions or accidental silences—these are purposeful interventions in the digital record to suppress the truth.

28. Officer Maurice Lawrence's BWC confirms he muted the audio while riding in the patrol car with ghost supervisor Sgt. Bradford Jones in the front passenger seat. Jones is never identified in any official paperwork, yet he is seen supervising, typing on the arrest narrative terminal, and coordinating with West and Bush—all while wearing no visible nameplate, speaking sparingly, and deliberately avoiding the camera's direct field of view.

29. At approximately 2:55 AM, Lt. West arrives at the scene in an unmarked white car. He immediately approaches Sgt. Cason and presses the mute button on his body cam as they confer just outside the residence gate. Their body language and physical gestures indicate a transfer of supervisory command, yet the audio is unavailable. This exact pattern mirrors the Pullease–Mata assault cover-up in 2021, where officers muted cams to obstruct future review.

30. At 3:03 AM, Officer Lawrence handcuffs Plaintiff and escorts him to the patrol car. Cason appears again in Officer Howe's camera at 3:05 AM, this time giving silent, non-verbal guidance to Howe on how to search Plaintiff's backpack—avoiding physical involvement or audio detection. The intent is clear: command and instruct, without creating evidence.

31. Only Officer Rachel Howe's BWC was produced in full, unedited, and without redactions. Howe maintained professional conduct throughout, did not mute her device, and did not lie on reports. This makes her footage a critical baseline for evaluating the suppression pattern across other officers' recordings.

Gautam v. City of Sunrise          Civil Rights Complaint

32. Plaintiff has demanded full chain-of-custody and access logs from the City of Sunrise and Axon (or any other evidence vendor), including:

33. Download logs and export timestamps,

34. Redaction approvals,

35. User access history,

36. System logs documenting deletion or editing.

37. To date, no such logs have been provided. The City's claim that "no other responsive records exist" is demonstrably false. BWC segments from Officers Bush and Lawrence include multiple cuts, frame jumps, and audio gaps inconsistent with the footage duration and metadata.

38. Plaintiff alleges that one or more officers intentionally accessed the BWC system post-incident to:

39. Mute key audio sections,

40. Delete exculpatory footage,

41. Redact or obscure timelines showing ghost command structure,

42. Align reports with a fabricated narrative of probable cause.

43. These digital alterations amount to evidence tampering, obstruction of justice, and civil rights violations. They also support a predicate act under the RICO statute, as the suppression of body cam evidence was executed in furtherance of protecting a criminal enterprise rooted in unlawful detainment, pension fraud, and retaliatory policing.

44. Because of this suppression, Plaintiff's ability to defend himself in his underlying criminal case was impaired. His public records requests (PRRs 250433–250441) were answered with false denials and unlawfully high fees. Key video evidence was only produced after a court compelled discovery in his criminal proceeding, demonstrating the City had possession and control the entire time.

45. Plaintiff respectfully demands the appointment of a federal forensic auditor to:

46. Review all Sunrise PD BWC retention and access logs,

47. Identify any deletion or tampering patterns across officer footage,

48. Subpoena Axon or third-party vendors for full technical histories,

49. Preserve all digital evidence relating to this incident.

50. This systemic suppression of digital truth is not only unconstitutional—it is criminal. It constitutes an act of concealment so brazen, and so consistent across officers and supervisors, that it could not have occurred without coordination. What began as a wrongful arrest

Gautam v. City of Sunrise          Civil Rights Complaint

transformed into a deliberate attempt to erase the proof, deny Plaintiff's rights, and protect those operating in the shadows.

51. C. The Pullease–Mata Assault and Institutional Cover-Up (2021)

52. In November 2021, the Sunrise Police Department was rocked by an internal incident involving the assault of a fellow officer—Amanda Mata—at the hands of her superior, Sergeant Christopher Pullease. This incident was not only caught on body-worn camera but confirmed by dozens of witness statements and an internal affairs investigation. Yet despite the overwhelming evidence, the department's response reflected a deeply entrenched system of suppression and complicity.

53. During the incident, Sgt. Pullease was seen on body-worn camera screaming at a handcuffed detainee, Jean Similien. His words were captured as follows:

54. "I will remove your fucking soul from your fucking body."

55. Officer Mata, present on scene and witnessing the escalation, took steps to de-escalate the situation—placing her hands gently on Pullease to signal restraint. Pullease responded with force and fury. In front of multiple officers, he:

56. Choked Officer Mata, wrapping his hands around her neck,

57. Shoved her violently against a police car,

58. Smacked her hands away in retaliation,

59. Pointed his pepper spray at her in a threatening manner.

60. What followed was a textbook suppression operation. Sgt. Pullease immediately ordered every officer on scene:

61. "Turn off your fucking cameras."

62. He then proceeded to:

63. Send text messages in a group thread instructing all officers not to speak about the incident,

64. Delete content from his phone, using data wiping applications to obstruct internal review,

65. Lie in his official statements, minimizing the incident and denying wrongdoing.

66. Despite more than 20 officers witnessing the event, and despite body cam footage clearly documenting the misconduct, Pullease was allowed to retire under investigation, face no serious criminal consequences, and retain his full DROP pension benefits.

67. The internal affairs report confirms that multiple officers feared retaliation if they spoke up. Officer Mata's identity was actively suppressed in both the media and public records. Her name was redacted in every file. The City of Sunrise refused to acknowledge her role, and

Gautam v. City of Sunrise          Civil Rights Complaint

Officer Mata was left unprotected despite being the sole truth-teller in a violent and traumatic chain of events.

68. Plaintiff's investigation into this incident revealed the truth. The identity of Amanda Mata was confirmed by matching officer rosters, badge numbers, and the full sworn affidavit obtained by Plaintiff under threat of public exposure. This affidavit—now part of Exhibit 3—contains:

69. Confirmed forensic phone wipe evidence,

70. Chain-of-command threats,

71. Retaliatory orders from Pullease to silence subordinates,

72. Confirmations by Lt. Paul Katz and over 20 signed witness statements from Sunrise Police personnel.

73. The Mata incident mirrors the same mechanisms that have been deployed in Plaintiff's case:

74. Body camera muting,

75. Command-level suppression,

76. Officer retaliation,

77. Pension-based exile of abusers,

78. Selective redaction and refusal to produce public records.

79. Pullease's ability to choke a fellow officer in front of dozens, escape accountability, and secure a lucrative retirement speaks volumes about the culture of protection that surrounds command staff in Sunrise. It is the same protection Michael West enjoys. The same protection granted to ghost officers like Bradford Jones and Deltamus Cason. It is the foundation upon which Plaintiff's own abuse was built.

80. Plaintiff demands that this case be reopened under federal review. That Officer Mata be granted whistleblower protections. That Sunrise's pattern of internal retaliation be formally recognized as an obstruction to justice.

81. The failure to act in the Pullease–Mata case emboldened the command staff who supervised Plaintiff's arrest just four years later. That failure—and the institutional rot it reflects—is now before this Court.

82. D. Public Records Obstruction and Racketeering Structure

83. Between April and May 2025, Plaintiff submitted a series of public records requests (PRRs) to the City of Sunrise, requesting materials directly related to his March 6, 2025 arrest, the officers involved, their pension and internal affairs histories, and records revealing whether certain individuals were retired, reassigned, or serving in covert supervisory roles. These

Gautam v. City of Sunrise          Civil Rights Complaint

requests were made pursuant to Chapter 119, Florida Statutes (the Florida Public Records Act), and were both timely and specific. The City's response—executed primarily through Felicia M. Bravo, the designated Public Records Custodian—was a calculated campaign of obstruction, delay, and bad faith.

84. The obstruction unfolded in four distinct stages:

85. Initial Denials and False Representations (April 14–28, 2025):

86. In PRR No. 250397, Plaintiff requested CAD logs, BWC videos, arrest reports, and internal comms tied to the March 6 incident. Bravo responded with a $1,017.61 quote and claimed "no responsive records" existed for key requested items—including dashcam video, internal communication, and property chain of custody records.

87. These denials were later proven false after a criminal court granted Plaintiff's Motion to Compel and the State produced responsive discovery, including BWC footage and CAD records that Bravo previously claimed were unavailable.

88. In PRRs 250434–250438, Plaintiff requested the personnel and disciplinary files of officers Michael West, Christopher Pullease, Louis Berman, Robert Johnston, and Officer Demacus Lawrence. Bravo stated that no such persons existed—despite clear public records, media coverage, and active court cases identifying them.

89. Obstructive Fee Demands and Surcharge Fabrication (May 2, 2025):

90. For PRRs 250435 and 250437, which requested settlement agreements and "retired under investigation" documentation for Sunrise officers from 2010–2025, Bravo demanded an outrageous upfront payment of $11,241.90.

91. This fee included a fabricated 25% "fringe/pension benefit surcharge," unlawfully padded onto staff time estimates—an action unsupported by Florida law and designed to suppress access.

**92. Plaintiff capped fees at $50 and asserted federal litigation privilege under active §1983 and RICO litigation. The City refused to comply.**

93. Partial, Redacted, and Deliberately Misleading Disclosures (May 5–9, 2025):

94. In response to pressure and legal filings, the City provided a batch of "Pension Election Certifications" for some retirees—but redacted all relevant retirement terms and omitted documentation for West, Berman, and Pullease.

95. No records were provided on the presence, pension eligibility, or DROP enrollment of ghost officers like Sgt. Bradford Jones and Sgt. Deltamus Cason.

96. Redactions were applied to known public officers, in defiance of binding precedent under Rojas v. FSU Board of Trustees.

97. Contradictions Between Discovery and Public Record Claims:

Gautam v. City of Sunrise          Civil Rights Complaint

98. After Plaintiff forced discovery through his criminal defense motion, he received BWC footage from Officers Howe, Lawrence, and Bush—clearly contradicting Bravo's claim that "no responsive video" existed.

99. Officer Demacus Lawrence, whom Bravo claimed "does not exist," is named in CAD, BWC, and sworn arrest reports.

100. Officer Robert Johnston, denied in PRR responses, is listed in multiple Sun Sentinel investigations and IA logs.

101. Bravo's denials and omissions appear not as isolated errors, but as part of a broader policy of concealment protecting "retired under investigation" personnel, ghost supervisors, and pension fraud beneficiaries.

102. These actions by Felicia Bravo and the City of Sunrise do not constitute mere administrative error or negligence. They represent a coordinated mechanism of fraud and racketeering under the guise of public service. The Florida Public Records Act was not just violated—it was repurposed as a weapon to obstruct litigation, shield wrongdoing, and delay accountability.

103. This systemic obstruction supports the Plaintiff's RICO claim by:

104. Facilitating concealment of racketeering profits (pension/DROP fraud),

105. Protecting individuals involved in unlawful arrest and suppression,

106. Preventing public and legal scrutiny of SERT team abuse, "ghost" deployment, and reemployment under concealed status.

107. Plaintiff requests this Court to:

**108. Declare that the City violated Fla. Stat. § 119.07 and § 119.12,**

109. Order the full production of all responsive records under judicial supervision,

110. Enjoin further use of fabricated surcharges and obstructive practices in retaliation for litigation,

111. Refer the pattern to the Florida Attorney General and U.S. Department of Justice for investigation into Sunshine Law and RICO violations.

112. This level of concealment, coordinated by city staff and aided by pension gatekeepers like Lt. West, is not a bureaucratic fluke—it is a criminal enterprise cloaked in government form.

113. E. DROP/Pension Fraud, Ghost Officers, and "Retired Under Investigation"

114. The City of Sunrise has constructed and preserved an entrenched system of pension abuse, DROP (Deferred Retirement Option Plan) manipulation, and unlawful reemployment of officers who have "retired under investigation." This system allows individuals with sustained

Gautam v. City of Sunrise          Civil Rights Complaint

misconduct histories to evade accountability, collect taxpayer-funded benefits, and reinsert themselves into operational control—off the books and beyond oversight.

115. At the center of this scheme is former Lieutenant Michael West. Publicly listed as "retired," West continues to operate in uniform, in the field, in full command authority. On March 6, 2025, West was captured on body-worn camera actively directing officers, coordinating with Sgt. Deltamus Cason and ghost supervisor Sgt. Bradford Jones. He arrived in an unmarked vehicle, participated in supervisory decisions, muted his camera during critical exchanges, and exercised decision-making authority that belies any claim of true retirement.

116. West also serves as Chairman of the Sunrise Police Officers' Retirement Plan, directly overseeing pension elections, DROP qualifications, and disbursements. This dual role—active field supervisor and pension gatekeeper—creates an irreconcilable conflict of interest. Officers who suppress evidence, protect West, or assist with off-book operations are rewarded with access to early retirement, DROP enrollment, and internal silence. Those who speak up, like Officer Amanda Mata, are redacted, silenced, or pushed out.

117. City Ordinances 124-X-19-A and 124-X-21-B created loopholes that:

118. Allow officers to "retire under investigation" with full benefits,

119. Permit reemployment under informal designations,

120. Authorize service in administrative, consulting, or "ghost" roles without transparent reporting,

121. Insulate pension board activity from civilian oversight.

122. Internal Affairs documents (Exhibit 5) reveal that officers with sustained misconduct—including Pullease, West, Berman—were allowed to exit the force quietly, avoid decertification, and preserve their pension rights. In many cases, their names were omitted from IA summaries, and the full terms of their separation withheld or redacted.

123. Exhibit 7 shows a rigged pension election process: every election from 2012 to 2024 was won "by virtue of no opposition." There is no oversight, no external auditing, and no transparency in the Sunrise Police Retirement Board. The same insiders retain control decade after decade.

124. Ghost officers like Sgt. Bradford Jones operate under this structure. Jones appears on multiple body cameras—commanding arrests, instructing officers, typing narratives—yet is omitted from CAD logs, dispatch records, and discovery. He receives protection from exposure and possible civil liability, yet he is clearly a functioning agent of the state.

125. Sgt. Deltamus Cason, also unlisted in official arrest documentation, plays a similar supervisory role. On March 6, 2025, Cason arrived at 2:55 AM and remained until 5:55 AM. He was captured on multiple BWCs issuing subtle, non-verbal instructions while avoiding direct

Gautam v. City of Sunrise            Civil Rights Complaint

involvement in detainment, searching, or force. This is the classic signature of "ghost supervision" under DROP fraud.

126. This system operates like a RICO enterprise:

127. Abuse occurs,

128. Officers are protected,

129. The paper trail is erased,

130. DROP pensions are distributed,

131. Supervisors rotate in new ghost operatives,

132. Repeat.

133. This structure exists not only in Sunrise, but statewide. Cities like Jacksonville, Miami, West Palm Beach, and Clearwater have documented cases of:

134. Unfunded pension liabilities caused by DROP abuses,

135. Rehiring of "retired" officers under ghost contracts,

136. Internal election rigging of pension boards,

137. Suppression of misconduct settlements through NDAs and redactions.

138. The Plaintiff's case is a prime example. He was arrested by a ghost team led by a retired officer, supervised by a sergeant who doesn't appear on any report, and processed by officers who directly benefit from pension gatekeeping. Every redaction, delay, and omitted record points back to the same motive: protect the retirement machine.

139. Plaintiff requests:

140. Full forensic audit of the Sunrise Police Pension Fund,

141. Subpoenas of all DROP participation logs from 2010–present,

142. Immediate suspension of pension board members involved in active law enforcement,

143. Publication of all "retired under investigation" agreements,

144. Injunction barring West, Pullease, and similar retirees from further city-affiliated operations.

145. This pension scheme is not merely unethical—it is the financial spine of a criminal justice racketeering network that must be dismantled in full view of the federal judiciary.

146. F. Harm to Plaintiff

147. As a direct and proximate result of the unlawful arrest, evidence suppression, pension-based command scheme, and public records obstruction described in this Complaint,

Gautam v. City of Sunrise          Civil Rights Complaint

Plaintiff Nihal Michael Gautam has suffered—and continues to suffer—severe, life-altering harm.

148. This harm is not abstract or speculative. It is quantifiable, immediate, and documented across professional, financial, emotional, and familial domains. The full weight of this systemic misconduct fell upon Plaintiff in the following ways:

149. Professional and Financial Harm:

150. Plaintiff is the licensed owner and operator of a multi-state insurance brokerage known as Sunny Benefits.

151. At the time of his arrest, Plaintiff was in the process of onboarding with multiple carriers and executing contracts with national healthcare providers.

152. As a direct result of the false arrest and extended detainment, Plaintiff lost key accounts and partnerships with major insurers, including Cigna and UnitedHealthcare—carriers with which Plaintiff had long-standing, high-value relationships.

153. The loss of these contracts directly impacted Plaintiff's monthly income, reputation in the industry, and long-term viability of his agency.

154. Plaintiff's business bank accounts, digital tools, and office devices were also frozen, locked, or delayed due to the fraudulent arrest record, creating a cascading shutdown of operations across multiple states.

155. Housing and Family Stability:

156. Plaintiff was evicted from his residence after missing rent while in jail and fighting retaliatory charges stemming from the March 6, 2025 arrest.

157. Due to the instability created by this event, Plaintiff has been separated from his one-year-old son, Leo, for over two months.

158. Plaintiff's ability to provide consistent parenting, emotional support, and financial security for Leo has been severely compromised.

159. Despite committing no crime and never being found guilty of any offense, Plaintiff has faced systemic punishment reserved for convicted individuals—with no recourse, no protection, and no restoration of dignity.

160. Emotional and Psychological Trauma:

161. The trauma of being detained in the presence of his infant son, handcuffed until his wrists swelled, and mocked by uniformed officers while locked in a hot patrol vehicle for over two hours caused Plaintiff lasting psychological damage.

Gautam v. City of Sunrise          Civil Rights Complaint

162. Plaintiff's trauma was further magnified by the visible and symbolic echoes of Kevin Desir's death. Desir—Plaintiff's best friend—was killed in Broward County custody under similarly negligent conditions.

163. During his own detainment, Plaintiff heard officers laughing, joking about "upping the charges," and callously dismissing his pain—experiences that triggered panic, dread, and a deep sense of spiritual violation.

164. Since the incident, Plaintiff has experienced symptoms of PTSD, anxiety, sleep disruption, and hypervigilance, especially around law enforcement personnel and vehicles.

165. Plaintiff has been forced to spend multiple nights on the street with his dogs, scrambling to find shelter and food while navigating litigation and fatherhood.

166. Legal, Reputational, and Civil Rights Injury:

167. Plaintiff's arrest records—though tied to dropped or reduced charges—continue to circulate in databases, flagging him as a threat in employment and housing screenings.

168. Plaintiff was never afforded full access to discovery until a court compelled it, and was repeatedly told key officers "did not exist"—a blatant obstruction of his constitutional right to due process.

169. Officers who participated in the cover-up, including West, Cason, and Jones, remain unaccountable and continue to benefit from pension protections and shielded identities.

170. Public records redactions and the City's refusal to acknowledge wrongdoing have rendered Plaintiff's pursuit of justice a logistical nightmare—delayed, denied, and burdened by gatekeeping designed to exhaust.

171. Symbolic and Spiritual Loss:

172. Beyond measurable damages, Plaintiff has experienced profound existential pain. He founded his business and built his life in Florida after surviving personal and financial collapse.

173. Kevin Desir was a light in that rebuilding—his friend, mentor, and protector. Kevin's death in custody was already a wound. Plaintiff's arrest reopened it.

174. The moment Plaintiff was placed in the police car, ignored, mocked, and held without care, he felt the system attempting to do to him what it did to Kevin.

175. But Plaintiff survived. He now walks with a mission to expose the mechanisms that nearly erased him—and already erased his friend.

176. Plaintiff brings this lawsuit not just to recover damages, but to create a permanent record. To document what was done. To warn others. And to demand that no other child be left alone while their parent is cuffed outside in the cold. No more ghosts. No more redactions.

177. G. Systemic Pension Fraud, DROP Corruption, and Officer Recycling

Gautam v. City of Sunrise          Civil Rights Complaint

178. The patterns identified in Sunrise, Florida are not isolated. They form part of a statewide ecosystem of pension manipulation, officer recycling, and systemic concealment that enables law enforcement personnel to commit acts of abuse and fraud, evade accountability, and continue to collect benefits and exercise informal power.

179. Across Florida, municipal law enforcement agencies have employed the Deferred Retirement Option Plan (DROP) and early pension incentives not as tools of public stewardship, but as financial shields for officers implicated in serious misconduct. These programs have been repurposed to silence whistleblowers, suppress disciplinary records, and rotate known abusers through a cycle of retirement, ghost deployment, and unregulated reemployment.

180. In Miami, West Palm Beach, Jacksonville, Clearwater, and other jurisdictions, court audits and press investigations have uncovered billions in unfunded liabilities, falsified work logs, and strategic use of DROP to accelerate payouts to officers who later return in unofficial or advisory roles. These practices erode public trust and undermine the integrity of every branch of the justice system.

181. Plaintiff's arrest and the events surrounding it expose this same architecture in Sunrise. Michael West, publicly retired, retains control as Pension Board Chair while actively directing field arrests. Sgt. Bradford Jones and Sgt. Deltamus Cason operate as ghost supervisors—present on scene, issuing orders, but absent from all formal documentation. These officers, though functionally active, are not recorded in payroll, body cam inventories, or public dispatch reports.

182. Exhibit 10 highlights the statewide scope of this scheme. According to the Florida Division of Bond Finance, municipal pension obligations have ballooned into the billions, threatening fiscal solvency and masking decades of waste and cover-up. The mechanisms facilitating this corruption—ghost rotations, internal redactions, no-contest pension elections—mirror those uncovered in this case.

183. The City's refusal to produce clear retirement records, reemployment logs, or transparency on DROP participation is not a bureaucratic glitch—it is an intentional continuation of this broader statewide fraud structure. Officers retire to avoid scrutiny, resurface in power, and help write the next generation of NDAs and redactions to protect the cycle.

184. Plaintiff urges this Court to recognize the broader implications of this lawsuit. The facts here are not just local—they're structural. The pension apparatus in Sunrise, and in cities like it, operates as a closed-loop racketeering system, rewarding silence, suppressing dissent, and enabling financial gain at the expense of public truth.

185. The same officers who violate civil rights walk away with million-dollar pensions. The same departments that lie under oath vote unanimously to "re-elect" their own into oversight roles. And the same fraudulent structures that destroyed Kevin Desir's life and nearly erased Plaintiff's are still intact.

Gautam v. City of Sunrise          Civil Rights Complaint

186. Only a full federal reckoning—through injunction, audit, and structural reform—can dismantle this enterprise. Otherwise, the same ghosts will rise again.

187. H. West–Cason–Jones Command Transfer Timeline

188. The March 6, 2025 arrest of Plaintiff was not merely a chaotic or uncoordinated response—it was a tactically controlled operation involving a hidden command handoff, executed silently, off-record, and visible only through careful reconstruction of body-worn camera footage. This timeline is Exhibit 1A in the supporting evidence and demonstrates how supervisory control was passed between Lt. Michael West, Sgt. Deltamus Cason, and Sgt. Bradford Jones, none of whom appear on official records as arresting officers.

189. 2:55 AM
– Sgt. Deltamus Cason arrives in an SUV, captured on Lt. Michael West's BWC.
– West immediately approaches Cason and mutes his camera, indicating a silent handoff of control.
– Neither officer is listed on the CAD log or arrest paperwork. Their interaction is deliberately concealed.

190. 3:00 AM
– Officer Terrell Bush's BWC activates inside the building. The camera begins muted, capturing only visuals.
– West, Cason, Bradford Jones, and Officer Maurice Lawrence cluster outside by the gate, forming a tactical unit.
– No audio exists for their command exchange. This matches suppression tactics used during the Pullease–Mata incident.

191. 3:03 AM
– Plaintiff is handcuffed by Lawrence and placed in the rear of the patrol vehicle.
– Cason is seen standing silently in the background, not intervening but clearly overseeing the action.
– Bradford Jones, whose name never appears in any arrest narrative, is seen riding in the front seat of Lawrence's vehicle—supervising directly.

192. 3:05 AM
– On Officer Rachel Howe's unmuted BWC, Cason is observed giving silent, non-verbal instruction to Howe as she begins to search Plaintiff's backpack.
– Cason never touches evidence, a deliberate effort to avoid accountability while exercising command.

193. 3:10 – 3:49 AM
– Plaintiff is held in the vehicle, handcuffed, begging for relief.
– Officers West, Jones, and Bush are captured laughing, mocking, and discussing "stacking charges."

Gautam v. City of Sunrise          Civil Rights Complaint

– Audio on multiple cameras is muted intermittently, concealing critical conversations.
 – No supervisors intervene despite visible signs of Plaintiff's medical and psychological distress.

194. 5:55 AM
– Sgt. Cason logs out of CAD, marking the end of his on-scene presence.
– He was never included in arrest reports, PC affidavits, or IA summaries.

195. This timeline proves the existence of a rotating, undocumented command tier—a "ghost" tier—designed to direct unconstitutional conduct while shielding those responsible. It mirrors prior suppression schemes (Pullease-Mata, ghost raids) and substantiates Plaintiff's claims under Monell, RICO, and Brady/Giglio.

196. The West–Cason–Jones axis represents a structural threat: command-level actors deploying force without visibility, supervision without name, and muting the truth—literally—while executing retaliatory arrests.

**197. COUNT I – 42 U.S.C. § 1983: False Arrest and Unlawful Seizure**

198. (Against All Defendant Officers and the City of Sunrise)

**199. Legal Basis:**
**Under 42 U.S.C. § 1983, individuals have the right to be free from unreasonable searches and seizures as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution. A false arrest claim arises when law enforcement officers detain an individual without a warrant, probable cause, or valid justification.**

200. Facts Supporting Claim:

201. Plaintiff was arrested on March 6, 2025, without a warrant and without probable cause.

202. Body-worn camera footage and officer statements captured on tape (see Exhibit 2) show Officer Carlos Lopez questioning the basis for the arrest, stating "that's lowkey some weak-ass PC."

203. No evidence existed to justify the arrest at the time of detainment.

204. Plaintiff was handcuffed, denied Miranda rights, and locked in a patrol car without any lawful basis for over two hours.

205. Supervisors West, Cason, and Jones—none of whom were listed in official paperwork—oversaw the arrest while remaining undocumented and unaccountable.

206. The unlawful arrest led to Plaintiff's eviction, separation from his child, and loss of professional contracts.

207. Defendants' Role:

Gautam v. City of Sunrise          Civil Rights Complaint

208. Officers Lawrence, Bush, Lopez, and others executed the arrest without lawful authority.

209. West, Cason, and Jones coordinated the operation and directed the unlawful seizure.

210. The City of Sunrise enabled the false arrest through failure to train and supervise its personnel, and through a pattern of deliberate indifference to constitutional violations.

211. Relief Sought:
Plaintiff seeks compensatory damages for the deprivation of liberty, emotional distress, loss of business and housing, and reputational harm. Plaintiff also seeks a declaratory judgment that his arrest violated his constitutional rights.

### 212. COUNT II – 42 U.S.C. § 1983: Excessive Force and Inhumane Conditions

213. (Against All Defendant Officers and the City of Sunrise)

**214. Legal Basis:**
**The Fourth and Fourteenth Amendments protect individuals from the use of excessive force and from being subjected to inhumane treatment while in custody. Under 42 U.S.C. § 1983, liability attaches where officers act with deliberate indifference to a person's safety, dignity, or constitutional rights.**

215. Facts Supporting Claim:

216. Plaintiff was handcuffed tightly for over 45 minutes and immediately notified officers of severe pain and loss of circulation.

217. Despite multiple verbal complaints captured on BWC—"These cuffs are too tight," "I can't feel my hands," "Please loosen them"—officers including Lawrence, Bush, and West took no corrective action.

218. Plaintiff was placed in the backseat of a patrol vehicle at 3:03 AM and held in extreme distress for over two hours with no water, no bathroom access, and no medical care.

219. Officers mocked Plaintiff's pain, joked about adding charges, and stood nearby laughing, as seen on BWC footage from Lawrence, Bush, and West.

220. Plaintiff's repeated requests for basic human dignity were met with sarcasm and ridicule, including Officer Bush stating, "You should've just asked," after finally loosening the cuffs nearly an hour later.

Gautam v. City of Sunrise          Civil Rights Complaint

221. No officer intervened or documented Plaintiff's complaints, and no use-of-force report was provided.

222. Plaintiff sustained injuries, emotional trauma, and lasting psychological damage due to the degrading and punitive conditions imposed on him without justification.

223. Defendants' Role:

224. Lawrence applied and failed to correct the painful handcuffs.

225. Bush, West, Jones, and other officers ignored cries for help and encouraged mockery.

226. Cason and Jones, acting as ghost supervisors, failed to intervene despite standing within feet of the vehicle.

227. The City of Sunrise failed to train its officers on proper detainee care, ignored a documented history of excessive force within the department, and allowed supervisors to act without accountability.

228. Relief Sought:

Plaintiff seeks compensatory and punitive damages for physical injury, psychological trauma, loss of liberty, and cruel and unusual punishment. Plaintiff also seeks injunctive relief requiring training, discipline, and body cam reform for detainee interactions.

**229. COUNT III – 42 U.S.C. § 1983: Failure to Intervene**

230. (Against All Defendant Officers Individually)

**231. Legal Basis:**

**Under 42 U.S.C. § 1983, an officer who witnesses another officer violating an individual's constitutional rights—and has a realistic opportunity to prevent or stop the harm—yet fails to act, may be held liable for failure to intervene. This doctrine is well-established in cases involving excessive force, false arrest, and due process violations.**

232. Facts Supporting Claim:

233. On March 6, 2025, Plaintiff was visibly suffering in police custody—handcuffed, restrained in a patrol vehicle, and crying out for relief.

234. Officers Bush, Lopez, Lawrence, West, Jones, and Cason were all present at the scene, within feet of Plaintiff, and had clear visibility into his deteriorating physical and emotional condition.

235. Plaintiff's pleas for help were recorded on multiple body cams: he complained of circulation loss, begged for water, and repeatedly asked for help.

236. Despite having the time, capacity, and authority to step in, no officer intervened or offered even basic care until nearly an hour after cuffing—long after serious discomfort and harm had occurred.

Gautam v. City of Sunrise          Civil Rights Complaint

237. Officer Carlos Lopez even questioned the arrest's legitimacy on tape: "That's lowkey some weak-ass PC," yet proceeded without intervening.

238. Supervisors West, Jones, and Cason, who wielded functional control over the scene, said nothing to stop the escalating harm—even as they laughed, muted cameras, and discussed charges off-the-record.

239. No officer reported misconduct by their peers. No officer contradicted fabricated narratives in the paperwork. No officer disclosed that ghost personnel like Jones were present.

240. Defendants' Role:

241. Each officer had a duty to protect Plaintiff from unconstitutional conduct by fellow officers.

242. Each officer had the opportunity to intervene but consciously chose silence, inaction, or complicity.

243. Their collective inaction constituted deliberate indifference to Plaintiff's rights under the Fourth and Fourteenth Amendments.

244. Relief Sought:

 Plaintiff seeks compensatory and punitive damages against all named officers for their individual failures to intervene. Plaintiff also seeks declaratory judgment affirming that their silence and complicity violated well-settled constitutional protections.

**245. COUNT IV – 42 U.S.C. § 1983: Monell Municipal Liability**

246. (Against Defendant City of Sunrise and Chief Anthony Rosa)

**247. Legal Basis:**
 **Under Monell v. Department of Social Services, 436 U.S. 658 (1978), a municipality may be held liable under § 1983 when a constitutional violation results from a policy, custom, or practice officially adopted—or tacitly permitted—by the city or its policymakers. Liability also attaches where a municipality's failure to train, supervise, or discipline employees evidences deliberate indifference to constitutional rights.**

248. Facts Supporting Claim:

249. The Sunrise Police Department operated under a known pattern of misconduct, including the use of ghost officers, unlawful supervision by retirees, routine evidence muting, and paperwork falsification—none of which were disciplined, corrected, or transparently addressed.

250. City officials, including Chief Anthony Rosa, Felicia Bravo, and command staff, were aware of the persistent use of retired personnel like Lt. Michael West in field operations, despite West being publicly listed as retired and serving as Pension Board Chair.

Gautam v. City of Sunrise          Civil Rights Complaint

251. Officers routinely omitted supervisors from arrest paperwork and redacted or altered body camera footage—demonstrating a department-wide culture of concealment.

252. No corrective actions were taken when ghost supervisor Sgt. Bradford Jones appeared across BWC footage, issuing orders but not listed in any official document.

253. In the Pullease–Mata assault, the City permitted a known abuser to retire under investigation and retain full pension benefits—without structural reform or transparency.

254. The City's public records responses to Plaintiff's requests were false, obstructive, and retaliatory—proving an official policy of denying citizens access to core constitutional evidence.

255. The consistent muting of body cameras, failure to read Miranda rights, and deliberate indifference to Plaintiff's custody needs were not anomalies—they were routine behaviors baked into the City's law enforcement practices.

256. Deliberate Indifference:

257. The City's refusal to acknowledge or document the presence of high-ranking personnel (Cason, West, Jones) demonstrates a pattern of strategic omission.

258. Pension Board elections were conducted "by virtue of no opposition," creating a closed-loop power structure that insulates misconduct.

259. The refusal to produce public records even in the face of federal litigation shows ongoing bad faith in compliance, oversight, and transparency.

260. Relief Sought:

 Plaintiff seeks a declaratory judgment holding the City of Sunrise and Chief Rosa liable under Monell for maintaining unconstitutional policies and customs. Plaintiff also seeks compensatory damages for harm caused by institutional failures, and an injunction requiring the City to overhaul training, public records compliance, and pension oversight.

**261. COUNT V – Civil RICO (18 U.S.C. §§ 1961–1968)**

262. (Against City of Sunrise, Lt. Michael West, Felicia M. Bravo, Sgt. Christopher Pullease, Chief Anthony Rosa, Sgt. Bradford Jones, and John Doe Officers 1–10)

**263. Legal Basis:**

 **The Racketeer Influenced and Corrupt Organizations Act (RICO) imposes civil liability on individuals and entities engaged in a pattern of racketeering activity conducted through an enterprise affecting interstate commerce. A "pattern" requires at least two predicate acts—including obstruction of justice, witness tampering, mail/wire fraud, and document destruction—within ten years. Under 18 U.S.C. § 1964(c), a person injured in their business or property may sue for treble damages and attorney's fees.**

Gautam v. City of Sunrise          Civil Rights Complaint

264. Enterprise:

The enterprise consists of a closed-loop network operated by City of Sunrise officials, Sunrise PD command staff, and pension board actors. Its members include:

265. Lt. Michael West (retired field commander & Pension Board Chair),

266. Sgt. Christopher Pullease (retired under investigation, pension beneficiary),

267. Felicia M. Bravo (records gatekeeper obstructing evidence access),

268. Sgt. Bradford Jones (ghost supervisor unlisted in records),

269. Chief Anthony Rosa (policy enabler, failed oversight),

270. and other unnamed City officials.

271. Predicate Acts Supporting RICO Claim:

**272. Obstruction of Justice – Suppression of BWC evidence, muting of key conversations, ghost officer cover-ups (18 U.S.C. § 1503).**

**273. Witness Tampering – Internal retaliation and suppression of Officer Amanda Mata post-Pullease assault (18 U.S.C. § 1512).**

**274. Mail and Wire Fraud – Use of official emails and certified communications to issue knowingly false PRR denials and inflated fee demands (18 U.S.C. §§ 1341, 1343).**

**275. Document Destruction – Deletion of internal phone data by Pullease; lack of BWC chain-of-custody logs; destruction or concealment of public records (18 U.S.C. § 1519).**

276. Fraud in Pension Administration – Use of DROP and pension board influence to shield abusers and reward silence (predicate for financial institution fraud).

277. Retaliation Against Whistleblowers – Internal chilling effect following Mata's assault intervention, confirmed by over 20 officers' silence.

278. Facts Supporting Claim:

279. Plaintiff was arrested by a team involving at least two "retired" officers, including West and Jones, neither listed in CAD or reports, yet captured on video commanding live operations.

280. Bravo falsely claimed no records existed, later proven untrue by discovery. She inflated PRR fees using a fabricated 25% pension surcharge.

281. West simultaneously ran pension board operations while directing field arrests—constituting self-dealing and enterprise control.

282. Pullease, after choking Officer Mata and ordering video deletions, was allowed to retire with full DROP benefits, part of a system used to shield criminal conduct.

Gautam v. City of Sunrise            Civil Rights Complaint

283. The entire suppression, muting, redaction, and refusal to disclose ghost rosters operated as an enterprise whose purpose was to silence, retaliate, and financially benefit insiders at taxpayer and constitutional expense.

284. Injury to Plaintiff:

285. Lost professional contracts with national insurers (Cigna, UHC).

286. Eviction and separation from his one-year-old son.

287. Business collapse due to reputational destruction and unlawful arrest.

288. Exhaustion of financial resources while pursuing access to concealed records.

289. Relief Sought:

**290. Treble damages under 18 U.S.C. § 1964(c),**

291. Permanent injunction against the use of "retired under investigation" officers in any City-affiliated role,

292. Dissolution or federal takeover of the Sunrise Police Officers' Retirement Plan pending forensic audit,

293. Appointment of a RICO compliance monitor for the City,

294. Costs and attorney's fees, and

295. Any further relief deemed just by the Court.


**296. COUNT VI – Violation of the Florida Public Records Act (Chapter 119, F.S.)**

297. (Against City of Sunrise and Felicia M. Bravo)

**298. Legal Basis:**
 **Florida's Public Records Act (Chapter 119, Florida Statutes) guarantees public access to records made or received in connection with official business. Under Fla. Stat. § 119.07, agencies must respond in good faith and without delay. § 119.12 permits attorneys' fees and sanctions where a request is unlawfully delayed, denied, or ignored.**

299. Facts Supporting Claim:

300. From April to May 2025, Plaintiff submitted multiple Public Records Requests (PRRs Nos. 250433–250441), clearly identifying the officers, incident dates, and materials sought—including BWC footage, CAD logs, officer personnel files, settlement agreements, and DROP pension data.

301. The City of Sunrise, via Felicia M. Bravo, responded with:

Gautam v. City of Sunrise          Civil Rights Complaint

302. False denials of existence ("no officer named Demacus Lawrence" despite video evidence),

303. Deliberate delay tactics,

304. Fabricated cost demands, including an $11,241.90 fee estimate inflated with a 25% "pension surcharge,"

305. Contradictory responses on whether SERT teams or retired officers existed.

306. Bravo falsely claimed there were "no responsive records" for multiple requests later confirmed by criminal discovery (e.g., BWC footage, CAD logs, arrest affidavits).

307. Internal contradictions show the City had responsive materials but refused production until forced via motion to compel in Plaintiff's criminal case.

308. On May 5, 2025, the City produced redacted and cherry-picked pension documents, omitting key DROP and IA records requested months earlier.

309. The City of Sunrise's responses violated timeliness, accuracy, and cost transparency obligations under Florida law.

310. The obstruction was retaliatory in nature, aimed at undermining Plaintiff's federal civil rights action and shielding municipal wrongdoing.

311. Relief Sought:

**312. Declaratory judgment that the City violated Fla. Stat. §§ 119.07 and 119.12.**

313. Full production of all responsive records, with no unlawful redactions or surcharges.

**314. Award of attorney's fees and litigation costs pursuant to § 119.12 (regardless of pro se status).**

315. Injunctive relief preventing further obstruction or retaliation by public records staff during ongoing litigation.

**316. COUNT VII – Negligence and Due Process Violations**

317. (Against City of Sunrise and Individual Officers)

318. Legal Basis:
Under the Fourteenth Amendment and common law tort principles, public officials have a duty to act with reasonable care when executing government authority, especially in situations involving arrest, detention, and property custody. Violation of due process occurs where an individual is deprived of liberty or property interests without fair procedures, notice, or an opportunity to be heard.

319. Facts Supporting Claim:

Gautam v. City of Sunrise          Civil Rights Complaint

320. Plaintiff was arrested without probable cause and held for hours in harsh conditions, in violation of his right to bodily security and humane treatment.

321. Plaintiff was never informed of the specific charges against him, nor was he provided any legal justification for his prolonged detainment.

322. The officers failed to issue Miranda warnings, explain custody procedures, or allow Plaintiff the opportunity to contact legal counsel during the initial stages of his arrest.

323. Plaintiff's business property (including sensitive client files and financial materials), pets, and phone were taken without documentation or chain-of-custody receipts.

324. No efforts were made to ensure the safety of Plaintiff's one-year-old son, Leo, who remained inside the home as both parents were detained or interviewed.

325. No officer documented what happened to Plaintiff's dogs, legal paperwork, or business equipment following his arrest.

326. The City of Sunrise failed to train its officers in basic custodial procedures, failed to implement safeguards for property handling, and failed to protect family stability in domestic response scenarios.

327. Defendants' Role:

328. Individual officers—including Lawrence, Bush, Lopez, and supervisory personnel—breached their duty of care to Plaintiff during and after his arrest.

329. The City of Sunrise negligently designed, trained, and supervised personnel in a manner that foreseeably resulted in the loss of property, harm to family integrity, and violation of procedural due process.

330. Injury to Plaintiff:

331. Plaintiff suffered measurable losses, including the destruction of professional relationships, separation from his son, loss of business revenue, and physical/psychological injury.

332. Defendants' negligence compounded the trauma of an already unlawful arrest and created a ripple effect of instability for Plaintiff's housing, health, and livelihood.

333. Relief Sought:
Plaintiff seeks compensatory damages for all financial, physical, emotional, and familial harm suffered due to Defendants' negligence and procedural failures. Plaintiff also seeks a declaratory judgment affirming the City's breach of its constitutional and common law duties.

**334. COUNT VIII – Injunctive and Declaratory Relief and Structural Reform**

335. (Against All Defendants)

Gautam v. City of Sunrise          Civil Rights Complaint

**336. Legal Basis:**

**Plaintiff seeks equitable relief under 28 U.S.C. §§ 2201–2202, Federal Rule of Civil Procedure 65, and the inherent powers of this Court to halt ongoing constitutional violations, prevent future harm, and mandate institutional reform. Declaratory and injunctive relief is appropriate where a continuing pattern of unlawful conduct or systemic risk threatens the rights of individuals.**

337. Facts Supporting Claim:

On May 22, 2025, all criminal charges stemming from Plaintiff's March 6, 2025 arrest were officially dismissed by court order. The dismissal—following months of suppressed evidence, delayed discovery, and contradicting officer accounts—confirms the retaliatory and unconstitutional nature of the arrest.

338. Defendants' conduct was not isolated. Instead, it reflects a coordinated municipal pattern involving:

339. False arrest without probable cause;

340. Suppression of body-worn camera footage and command channel audio;

341. Ghost supervision by unlisted officers including Lt. Michael West, Sgt. Deltamus Cason, and Sgt. Bradford Jones;

342. Whistleblower suppression, as evidenced by the redaction and retaliation against Officer Amanda Mata following the Pullease incident;

343. Pension and DROP scheme abuse, with supervisors retiring "under investigation" and retaining operational control;

344. Public records obstruction by City Clerk Felicia Bravo, including unlawful fee demands, delayed responses, and contradicting denials.

345. These practices are ongoing, deeply embedded in institutional culture, and have chilled whistleblowing, obstructed access to justice, and placed other civilians at imminent risk of similar harm.

346. Relief Sought:

Plaintiff respectfully requests this Court:

**347. Declare that Defendants' actions violated Plaintiff's rights under the First, Fourth, and Fourteenth Amendments, 42 U.S.C. §§ 1983, 1985, and Florida Statutes Chapter 119;**

348. Issue a permanent injunction restraining Defendants and the City from:

349. Using or deploying unlisted officers or "ghost supervisors" without full documentation;

350. Retaliating against whistleblowers or altering IA/public records to conceal internal misconduct;

Gautam v. City of Sunrise          Civil Rights Complaint

351. Reemploying "retired under investigation" officers in command or pension oversight roles;

352. Mandate federal oversight and audit of:

353. The Sunrise Police Department's pension system, DROP records, and reemployment practices;

354. All public records processing and fee calculation methods since 2010;

355. Require the City to implement a Sunshine Compliance Policy with:

356. Real-time public tracking of IA complaints and public records logs;

357. Transparent documentation of all officer deployments, retirements, and reappointments.

358. Without court intervention, the same structural forces that led to Plaintiff's unlawful detention and the death of Kevin Desir in Broward custody will continue to place civilians, whistleblowers, and investigators at risk.


359. RELIEF REQUESTED

360. Plaintiff respectfully demands judgment against all Defendants, jointly and severally, as follows:

361. Compensatory damages in excess of $500,000,000 for emotional distress, loss of liberty, reputational damage, business destruction, and family separation;

362. Punitive damages against individual Defendants whose conduct was malicious, retaliatory, or grossly indifferent to Plaintiff's rights;

**363. Treble damages pursuant to 18 U.S.C. § 1964(c) for the civil RICO violations outlined in this Complaint;**

**364. Declaratory judgment affirming that Defendants violated Plaintiff's rights under the Fourth, First, and Fourteenth Amendments, 42 U.S.C. § 1983, § 1985, and Florida Statutes Chapter 119;**

365. Permanent injunctive relief, including:

366. Federal oversight of Sunrise PD operations and pension systems;

367. Independent forensic audits of all pension/DROP records from 2010–present;

368. Removal and permanent disqualification of any "retired under investigation" officer from supervisory, advisory, or pension board roles;

369. Preservation orders for all BWC, dispatch logs, and evidence systems;

Gautam v. City of Sunrise          Civil Rights Complaint

**370. Attorney's fees and litigation costs, even though Plaintiff is pro se, under 42 U.S.C. § 1988, 18 U.S.C. § 1964(c), and Fla. Stat. § 119.12;**

371. Any additional relief that the Court deems just, proper, and necessary to ensure accountability, transparency, and protection of civil rights within the City of Sunrise and beyond.

372. EXHIBIT INDEX

373. Exhibit 1A – Officer Arrival & Command Timeline (March 6, 2025):
Detailed timeline of officer arrivals and muted command structure, showing coordination between Lt. West, Sgt. Cason, and Sgt. Bradford Jones across multiple BWCs. Demonstrates ghost supervision and evidence suppression during Plaintiff's arrest.

374. Exhibit 1B – Ghost Officer Discrepancy Table:
Table comparing officers seen on body cam footage with those listed in CAD, arrest reports, or discovery. Confirms the presence of unlisted supervisory personnel directing Plaintiff's arrest.

375. Exhibit 2 – BWC Footage Breakdown: Officer Rachel Howe:
Full narrative timeline of Officer Howe's body-worn camera. Demonstrates her ethical conduct, lack of muting, and clear documentation of misconduct and illegal coordination by other officers.

376. Exhibit 3 – Pullease–Mata Assault: Criminal Affidavit & IA Findings:
Includes notarized probable cause affidavit, witness statements, and internal affairs records proving Sgt. Christopher Pullease assaulted Officer Amanda Mata and ordered the suppression of all body cam evidence.

377. Exhibit 4 – DOJ Audit of Sunrise Police Department (2014):
Department of Justice audit confirming systemic corruption, entrapment-for-profit tactics, and recommended criminal referral of Lt. Michael West.

378. Exhibit 5 – Internal Affairs Logs: Pullease, West, Berman:
PRR responses and IA record summaries confirming sustained findings, ongoing concealment, and failure to discipline.

379. Exhibit 6 – City Ordinances: 124-X-19-A and 124-X-21-B:
Official legislative text outlining DROP and pension enhancements that enabled ghost officer reactivation, retirement under investigation, and concealed pension awards.

380. Exhibit 7 – Pension Board Election Certifications (2012–2024):
Certification records showing Michael West and others retained unopposed control over the Sunrise Police Officers' Retirement Plan without public challenge or oversight.

381. Exhibit 8 – Public Records Obstruction and Fee Scheme:
8A – City of Sunrise denial of SERT Team existence
8B – Contradictory denials of Robert Johnston and Demacus Lawrence
8C – $11,241.90 unlawful cost estimate for PRRs 250435 and 250437
8D – Pension Ordinance response files and redacted disclosures

Gautam v. City of Sunrise                Civil Rights Complaint

8E – IA denial of known officers
8F – Delayed or partial PRR responses from Bravo (250433–441)

382. Exhibit 9 – Business Harm and Employment Retaliation:
9A – Cigna Correspondence and Termination
9B – UnitedHealthcare Appeals and Denial
9C – Economic Harm Timeline: Eviction, Separation, and Lost Income

383. Exhibit 10 – March 6, 2025 Arrest Materials and Case Dismissal Records:
Includes criminal docket, March 28 arrest report, and May 22 dismissal confirmation. Confirms wrongful arrest, dropped charge, and court disposition.

384. Exhibit 11 – Final Settlement Demand and City Silence:
Final civil settlement demand (April 27) and follow-up communications to City officials and Sunrise PD. No response received by April 30 deadline. Documents attached include public records preservation notice, emailed declarations, and proof of service.

385. Plaintiff reserves the right to file supplemental exhibits as discovery proceeds or new violations emerge.

386. Respectfully submitted,
/s/ Nihal Michael Gautam
Nihal Michael Gautam
840 SW 6th St, Hallandale, FL 33009
Phone: (347) 753-0490
Email: admin@sunnybenefits.me
Dated: May 22, 2025

Gautam v. City of Sunrise             Civil Rights Complaint

**Respectfully submitted,**

Dated: May 22, 2025

/s/ Nihal Michael Gautam
Nihal Michael Gautam, Plaintiff Pro Se

Gautam v. City of Sunrise          Civil Rights Complaint

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Nihal Michael Gautam,
 Plaintiff,

v.

City of Sunrise, et al.,
 Defendants.

Case No.: 0:25-cv-60841-JMS

---

MOTION PACK ATTACHED TO SECOND AMENDED COMPLAINT

1. MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS

- Includes sworn declaration of indigency

2. MOTION FOR U.S. MARSHALS SERVICE OF PROCESS

- Pursuant to Rule 4(c)(3)

- Lists all named defendants, including ghost and retired officers

3. EMERGENCY MOTION FOR PRESERVATION ORDER

- Seeks preservation of BWC, CAD logs, pension records, PRRs, IA files, and communications

4. MOTION TO UNSEAL RELATED CASES AND INTERNAL FILES

- Requests unsealing of IA/criminal/disciplinary files on Pullease, Mata, West, Jones, Berman, and Johnston

5. MOTION TO COMPEL IMMEDIATE DISCOVERY

- Lists specific items (BWC metadata, PRRs, IA docs, pension logs, property/evidence logs)

Gautam v. City of Sunrise                    Civil Rights Complaint

6. MOTION FOR PROTECTIVE ORDER – WHISTLEBLOWER AND WITNESS SAFEGUARDS

- Requests protection for Officers Mata and Howe

- Blocks retaliation or redaction of whistleblower roles

7. MOTION TO APPOINT INDEPENDENT MONITOR

- Requests federal monitor under Rule 53 to audit evidence compliance, pension records, whistleblower protection, and IA materials

All motions are dated May 22, 2025, and signed:
/s/ Nihal Michael Gautam
840 SW 6th St
Hallandale Beach, FL 33009
(347) 753-0490
admin@sunnybenefits.me