FILED BY_____ABM_____D.C.

*Apr 7, 2026*

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FTL

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 0:25-cv-60841-JMS**
NIHAL MICHAEL GAUTAM, Plaintiff
*v.*
CITY OF SUNRISE, FLORIDA, et al., Defendants
**PLAINTIFF'S UNIFIED OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DE 74)**
*WITH INCORPORATED BWC RECONSTRUCTION,*
*SUPPLEMENTAL DECLARATION UNDER 28 U.S.C. § 1746,*
*AND REQUEST FOR DEFERRAL UNDER RULE 56(d)*
Nihal Michael Gautam, Plaintiff Pro Se
840 SW 6th Street, Hallandale, FL 33009
954-489-8883 | nihalg5555@gmail.com

## I. PRELIMINARY STATEMENT

Defendants' Motion for Summary Judgment (DE 74) asks this Court to accept a version of events that is contradicted at every material point by Defendants' own deposition testimony, body-worn camera footage, audit trail records, and training materials. The Motion relies almost exclusively on a self-serving Declaration of Officer Lawrence—filed for the first time with this Motion—while ignoring the sworn deposition testimony of Lieutenant West, Sergeant Cason, Officer Bush, and the City's Rule 30(b)(6) designee Sergeant Goldstein.

Defendants' brief does not mention the 6:42 AM incident report creation, the 9:23 AM charge initiation, the page 2 to page 11 packet discontinuity, the fact that the bite allegation does not appear in the 911 call, Jones's on-camera "tac debrief" admission, the coordinated camera gap, the unidentified officer on six camera angles, the Axon audit trail showing Lawrence's 2:56 AM Evidence.com logins, the unproduced citizen audio file, the 100-year retention dates on Bush's arrest photos, or the twelve documented discovery contradictions.

What Defendants present is a sanitized narrative sourced to one officer's declaration, framed in the light most favorable to the moving party rather than the non-movant, and filed on the same day Defendants defaulted on nineteen supplemental discovery requests. Plaintiff submits that the Court should look at the full record.

## I-A. THE PRE-STAGING SEQUENCE: OFFICERS WERE ALREADY CYCLING NEAR THE SCENE

The Axon audit trail records reveal that the officers who responded to the domestic call were not arriving cold. They were already cycling together in the area on a sequence of calls in the hours before the domestic incident was created in CAD at 02:20:44 AM. The audit trail shows the following pre-staging sequence:

At approximately 12:38 AM, Lawrence and Jones appear together on a suspicious-vehicle call. At approximately 1:08 AM, Jones, Lopez, and Lawrence appear together on a suspicious-person call. At approximately 1:40 AM, Lawrence and Jones appear again on another call. At 2:13 AM, Jones has a solo unlinked BWC video with no corresponding Lawrence footage. Then at 2:18–2:19 AM, Lawrence and Bush appear on a separate medical/choking call (Incident 013072) immediately before the domestic call (Incident 013074) was created at 2:20:44 AM. Bush's audit trail also reflects preservation actions tied to both incidents 013072 and 013074 during the same session window.

This pre-staging sequence is significant because it shows that Lawrence, Jones, and Bush were not independently dispatched strangers arriving separately at a domestic call. They were already operating together in the area for nearly two hours before any 911 call was placed. The coordination visible on body-worn camera during the domestic incident—the simultaneous camera cuts, the debrief, the coached statement, the documentation decisions deferred to West— is consistent with a group of officers who were already operating as a unit before the call that generated the arrest.

## I-B. THE DV LABEL WITHOUT A DV CHARGE

Plaintiff was charged with simple battery under §784.03, Florida Statutes—a first-degree misdemeanor. That is not a domestic violence charge. Yet the City applied a domestic violence label administratively, triggering restrictions including no-contact conditions, DV-coded booking, and consequences that follow a person in background checks, housing applications, employment screening, and custody proceedings. No formal DV charge was filed by the State Attorney. No DV enhancement was pursued. The SAO ultimately entered a nolle prosequi— dropping the case entirely without a merits finding, without a hearing, and without any formal determination that the arrest or process was lawful.

The DV label was applied without a corresponding DV charge, without due process, and without a hearing. The incident report itself contains the charge type "Traffic"—a default field that does not match either a DV classification or a simple battery classification. The probable cause affidavit uses the phrase "by persons unknown to me" in a case involving two known, identified parties in a domestic relationship. These template indicators suggest the paperwork was not prepared for this specific incident but was assembled from generic forms after the fact.

## I-C. ADDITIONAL RECORD-INTEGRITY DEFECTS

The 911 call was not an urgent-violence call. It was classified as "O-NON 911 CALL" in CAD. The caller's opening statement was that the incident was over and Plaintiff had left. The dispatcher did not meaningfully ask about injuries, child safety, or immediate danger. The caller's son was asleep in the apartment, yet no child-welfare inquiry was made on the call and no officer treated the scene as a child-endangerment emergency upon arrival. The dispatch framing is inconsistent with the later "active violent domestic assault" narrative Defendants construct in their Motion.

The probable cause affidavit is facially deficient. The supervising attorney line is blank. The comments field is blank. The affiant identity is unclear. No clean signed sworn victim statement has been identified in the production with a completed execution block. The "personally appeared" language indicates the formal statement was taken after Plaintiff was already in custody. If a follow-up or rewritten statement was obtained after arrest, that supports the arrest-first, narrative-later theory.

The arrest paperwork omits any reference to Plaintiff's dogs or property chain of custody, despite dogs and property being central to the incident and the reason Plaintiff returned to the door. No property receipt was generated. No inventory was documented. No chain of custody was established on camera. West's deposition response regarding property: "If it doesn't exist, it doesn't exist." The City's April 24, 2025 public records response confirmed that no dash camera footage exists, no internal emails or messages were provided, no chain of custody for pets or alleged property damage was produced, and photos and evidence were "pending"—while demanding payment before producing any records. That is not transparency. That is obstruction.

## II. THE REAL-WORLD CUSTODY TIMELINE

The following timestamps are drawn from official records and are not in dispute. Defendants' brief uses BWC video runtime markers to make the detention appear compact. The actual custody process, measured by clock time, was far longer:

| TIMESTAMP | EVENT / SOURCE |
|---|---|
| 02:20:44 | CAD incident created — non-emergency call. [CAD Report] |
| ~02:22 AM | Plaintiff visible on Howe BWC walking toward gate with dogs — leaving. First seizure. [Howe BWC] |
| 02:25:54 | First unit officially arrives per CAD. [CAD Report] |
| ~02:34:07 | West visible on Howe BWC — on scene 15 min before CAD arrival of 02:49. Multiple marked units visible. [Howe BWC] |
| ~02:36 AM | West radios Bush while Bush's camera activates. West directs Bush to photograph injuries, complete the affidavit, and have Lawrence call him. Real-time operational command issued from outside the gate before any sworn statement or affidavit existed. [Bush BWC] |
| ~02:38 AM | Bush exits apartment through gate with pre-prepared affidavit, unidentified tablet, DV pamphlet. Off-camera meeting with West/Lopez. [Bush/Jones BWC] |
| ~02:40 AM | Jones: "We're just having a lil debrief." Three cameras cut simultaneously. Six-minute gap. [Jones BWC] |
| ~02:46 AM | Cameras restart. Kitchen (different room). Muted buffer: coaching from two angles. Jones administers oath. [Lawrence/Jones BWC] |
| ~02:47 AM | Victim doesn't know time or charge. Looks at Jones. Jones nods. She says battery. [Jones BWC] |
| ~02:50 AM | All cameras cut. Group tac debrief at gate. Videos start muted. Bush: "weak ass PC." [Multiple BWC] |
| ~03:03 AM | Cuffing. Bush grabs arm. Lawrence cuffs. Cason grabs bag. Howe searches. No inventory. [Jones BWC] |
| ~03:03–09 | Bush panics on camera. "Tac debrief." Taps Jones. Cameras off. Howe: "bullshit report." [Jones BWC] |
| ~03:09+ AM | Jones: "Let's go map out the PC." Officers laugh. West: Cason will "definitely approve." [Jones BWC] |
| 03:13 AM | CAD reflects transport/custody activity. Station custody begins. [CAD Report] |
| 03:19 AM | Official arrest time on paperwork — 55 min after seizure. [Arrest Report] |
| 05:21 AM | Booked at BSO Main Jail. No completed report exists. [BSO Booking Record] |
| 06:42 AM | Incident report created — 4+ hours after seizure, 1+ hour after booking. [Incident Report] |
| 06:49 AM | Lawrence creates Axon Community Request for "AUDIO" on Incident 422503013074. [Axon Audit] |
| 08:51 AM | File "New Recording 3.m4a" uploaded via citizen portal. Never produced. [Axon Audit] |
| 09:23 AM | Charge initiated at BSO — 7 hours after seizure. [BSO Booking Record] |
| 03:47 PM | Lawrence electronic signature — 13+ hours after seizure. [Incident Report] |
| 04/14/2025 | Report printed by "SN 1400" — unknown user, day after demand letter. [Report Metadata] |

Defendants' use of BWC video runtime markers (e.g., "at the 10:45 mark," "at the 56:40 mark") compresses the custody experience into what appears to be a single continuous recording. In reality, Plaintiff was in continuous custody from approximately 2:22 AM through booking at 5:21 AM—a period of approximately three hours—during which documentation was being constructed, cameras were being coordinated, and the probable cause narrative was being shaped. The runtime markers on any single officer's BWC do not reflect the actual elapsed time of Plaintiff's detention.

## III. THE BWC RECONSTRUCTION: WHAT THE FOOTAGE ACTUALLY SHOWS

### Phase 1: Coordinated Arrival (~2:26–2:32 AM)

Jones, Bush, and Lawrence all have brief initial clips (30 sec–2 min) beginning ~2:26–2:27 AM that cut simultaneously. All three restart at ~2:32 AM. Officers walk up together with no urgency—calm, organized, unhurried. This is inconsistent with a response to a reported violent domestic assault with a toddler present. The simultaneous cut-and-restart across three independent cameras is consistent with coordinated camera activation.

### Phase 2: Inside the Apartment—No Investigation (~2:32–2:38 AM)

Lawrence goes to bedroom with victim. Takes zero notes. No officer examines injuries. No officer asks about the bite. No officer photographs anything. The victim initially says "his dogs," quickly corrects to "our dogs"—a coached shift in framing that changes the property and residency context. Bush goes directly to the balcony, states "that's how she could see us"—the victim never said this. Bush constructs a narrative explanation rather than documenting a reported fact. Bush then slams the balcony door, producing a loud sound on audio during the same window when the arrest narrative later references Plaintiff "breaking things." The victim does not say she wants to press charges.

### Phase 3: Bush Exits—Off-Camera Gate Meeting (~2:38 AM)

Bush exits apartment, goes through gate, meets West and Lopez off camera where Plaintiff is detained. Next BWC: Bush is back inside filling out the top of the affidavit, taking photos, stating West told him to come back. Bush gave West "everything he had." The pre-prepared affidavit existed before the sworn statement was recorded.

### Phase 4: TAC Debrief and Camera Cut (~2:40 AM)

Victim asks if officers are coming back. Jones: "Yeah, we're just having a lil tac debrief, that's all." Jones and Lawrence exit. Cameras cut simultaneously. Six-minute gap. No urgency, no panic—calm and rehearsed. Lopez also turns camera off at gate. Four officers, four cameras, all dark in the same window.

### Phase 5: The Coached Statement (~2:46–2:50 AM)

Cameras restart. Officers now in kitchen—different room from initial contact. The location changed during the unrecorded gap. Jones administers the oath—the FTO Defendants call a passive observer placed the victim under oath. Muted buffer: Lawrence with victim, coaching visible, victim nodding. Same buffer on Jones BWC from second angle. Statement begins: disorganized, internally inconsistent—punched, pushed, nose, face, bit in varying combinations with no chronology. She doesn't know the time. Looks at Jones for the charge. Jones nods. She says battery. Jones radios West: "Lt, he's doing the affidavit now." Bush and Jones discuss: "I hope that's what he decides as to Lt West."

### Phase 6: Post-Statement—"Weak Ass PC" (~2:50–3:00 AM)

Officers examine for additional injuries. Chest: no marks. Nose: no marks. Neither documented in any report. Bush states to Lopez: "That's some weak ass PC" about the redness—an on-camera admission by the affidavit officer that the probable cause was, in his own judgment,

insufficient. All cameras cut ~2:50. Next footage: group tac debrief at gate with West, Cason, Jones, Lawrence, Bush. Videos start muted.

### Phase 7: Arrest, Property, and "Map Out the PC" (~3:00–3:09 AM)

Jones BWC restarts with muted buffer. Officers laughing. West giving instructions. Group approaches Plaintiff. Lawrence asks if Plaintiff bit her. Plaintiff says no. Cuffing at ~3:03: Bush grabs arm, Lawrence applies cuffs, Cason grabs backpack, Howe searches it—all simultaneously. No property inventory, no receipt, no documentation on camera. Officers cluster back around belongings. West grabs bag, gives it to Bush. Howe: "What do you want me to still write up that bullshit report?" Howe asks what victim said—doesn't even know. Lawrence explains bite. Bush panics on camera, says "tac debrief," physically taps Jones. Cameras off 3:03–3:09. Jones: "Let's go map out the PC." Officers laugh. West confirms Cason will "definitely approve it."

### Phase 8: Dogs and Station (~3:09+ AM)

Dogs returned to apartment while PC still being constructed. Bush says "map out the PC" during dog return. No chain of custody for property. No inventory. West: "If it doesn't exist, it doesn't exist." Plaintiff remains in patrol vehicle from ~3:13 AM to 5:21 AM—over two hours at station without documentation, charge, water, or bathroom.

### Complete Camera Coordination Sequence

| TIME | EVENT | FOOTAGE |
|---|---|---|
| ~2:26–27 | ALL CUT | Jones, Bush, Lawrence: brief clips cut simultaneously. |
| ~2:32 | ALL RESTART | Three cameras restart. Officers walk up together, no urgency. |
| ~2:38 | BUSH EXITS | Exits gate. Off-camera meeting with West/Lopez. Returns with affidavit. |
| ~2:40 | TAC DEBRIEF | Jones: "tac debrief." Jones/Lawrence cut. Lopez camera off. Four cameras dark. |
| ~2:46 | RESTART | Kitchen. Muted buffer: coaching. Jones oath. Victim's disorganized statement. |
| ~2:50 | ALL CUT | Post-statement. Next: group debrief at gate, videos muted. "Weak ass PC." |
| ~3:00 | JONES RESTART | Muted buffer. Officers laughing. West instructs. Group approaches Plaintiff. |
| ~3:03 | ARREST | Cuffing. Bag grabbed. Searched. No documentation. Property unlogged. |
| ~3:03–09 | PANIC CUT | "Bullshit report." "Weak ass PC." Bush taps Jones: "tac debrief." Cameras off. |
| ~3:09+ | MAP PC | Jones: "map out the PC." Officers laugh. Cason will "definitely approve." |

## IV. POINT-BY-POINT RESPONSE TO DEFENDANTS' MOTION

### Point 1: Self-Serving Declaration vs. Deposition Record

Defendants cite "Lawrence Dec." in 43 of 46 paragraphs while ignoring West ("who knows what's real time," "that's all I needed"), Cason (never spoke to victim, zero BWC, suspended for computer misconduct), Bush (can't ID injured hand or device), and Goldstein (reviewed nothing, never checked logs). A self-serving declaration does not override prior sworn deposition testimony. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

### Point 2: Bite Allegation Absent From 911 Call

The 911 call—the only contemporaneous record—is a non-emergency call. Caller: "It's over. Fortunately he left my house." She said "trying to hit me" but never described a bite, hand injury, or medical need. The bite appears for the first time in the post-debrief sworn statement after coaching visible on two angles and Jones's nod directing the charge. A reasonable jury could find the allegation was manufactured.

### Point 3: Seized at 2:22 AM, Not 3:19 AM

Howe's BWC shows Plaintiff in officer custody at ~2:22 AM—walking away with dogs. Official arrest: 3:19 AM. Fifty-five minutes of detention without investigation, statement, or affidavit. Probable cause must exist at the moment of seizure. Henry v. United States, 361 U.S. 98 (1959). At 2:22 AM, officers had only a non-emergency call saying the incident was over and the subject had left.

### Point 4: Manufactured Probable Cause Sequence

Every case Defendants cite involves officers who received reports from independent third parties. This case involves officers who conducted a debrief, cut three cameras simultaneously, coached the victim, and directed her to the charge through a nod—before the "sworn statement." The reliance-on-victim-statement doctrine presupposes independent reporting. Here, the record supports manufactured probable cause. Beck v. Ohio, 379 U.S. 89 (1964).

### Point 5: West Commanded the Operation

Lawrence was not the sole decision-maker. West directed Bush to return for photos, received real-time reports on the affidavit, commanded documentation decisions, confirmed Cason would "definitely approve," arrived 15 minutes before CAD, and never activated his camera. The footage shows West commanding every aspect from outside the gate.

### Point 6: Paragraph 40 Is a Monell Admission

Defendants' own ¶40: "Deactivation or muting is allowed when an officer is discussing strategic, investigative or administrative operations. The videos associated with this event had periods of deactivation during officer discussions falling within policy." That admits the TAC debrief—during which the probable cause narrative was shaped—occurred pursuant to official City policy. If the policy enabled the violation, the policy was the "moving force." Monell, 436 U.S. at 694.

### Point 7: Arguable PC Does Not Protect Manufactured PC

In Richmond v. Badia, independent school employees reported a push. Here, officers manufactured the information through a coordinated process. Manufacturing probable cause through a coordinated unrecorded process is not objectively reasonable under any standard. Pearson v. Callahan, 555 U.S. 223 (2009).

### Point 8: Excessive Force—Full Custody Period

This is not a handcuff-discomfort case. Plaintiff was seized at 2:22 AM, cuffed at 3:03, at station by 3:13, booked at 5:21—over two hours at the station without documentation, charge, water, or bathroom. Defendants acknowledge statements at 8:40, 22:00, 24:30, and 27:00 were "unwitnessed" and "outside of earshot." An officer who cannot hear complaints cannot claim the detainee did not complain. Graham v. Connor, 490 U.S. 386 (1989): misdemeanor, leaving scene, not resisting.

### Point 9: "Mere Backup" Contradicted by Video

**OFFICER DOCUMENTED INVOLVEMENT**

**Bush**     **Wrote victim narrative. Photos with unidentified tablet. Assisted cuffing. Pre-prepared affidavit outside gate. Returned at West's direction. "Weak ass PC." 100-year retention on arrest photos. Loosened cuffs 1 hour later.**

| | |
|---|---|
| **Jones** | **Administered oath. "Tac debrief." Nodded to identify charge. Radioed West re affidavit. "Map out the PC." BWC withheld from criminal discovery.** |
| **Cason** | **3+ hours, zero BWC. Never spoke to victim. Approved arrest without review. Denied then confirmed muted meeting. Grabbed bag. Suspended for computer misconduct.** |
| **West** | **Directed photos, documentation, approval from outside gate. Real-time reports. On scene 15 min before CAD. Zero BWC. Never interviewed victim.** |
| **Lopez** | **Camera off during gate meeting. Subject of false employment certification.** |

### *Point 10: Monell—Everything Since Plaintiff's Deposition*

Defendants cite Plaintiff's pre-discovery deposition. Since then: Goldstein confirmed TAC debrief as official policy and metadata existence; audit trails produced; AB4 training deck produced. Five independent Monell theories:

| #THEORY | RECORD SUPPORT |
|---|---|
| 1 **Detention-First, Documentation-Later** | West: "that's all I needed." Jones: "map out the PC." 55-min gap. Post-booking report. 4-hour charge gap. |
| 2 **Systemic BWC Accountability Failure** | 30(b)(6) reviewed nothing. Metadata never checked. TAC debrief official policy. AB4 deck: stealth, mute, configurable settings. ¶40 admits deactivations "within policy." |
| 3 **Ghost Officer Documentation Pattern** | Huggard: present then not. Jones: present, not in reports. Aja/Negron on report, not on CAD. Approval chain changed. Officer on 6 cameras unidentified. |
| 4 **Training Deck as Policy Evidence** | Official training + official settings + official policy (Ch. 14) + official platform. City configured system, trained officers, never verified compliance. |
| 5 **Failure to Train (Canton v. Harris)** | AB4 deck trains officers on stealth, mute, selective upload, metadata manipulation, grouped-video separation, false-signal dismissal—but shows zero training on safeguards, accountability, or prohibitions against abuse. City of Canton v. Harris, 489 U.S. 378 (1989). |

### *Point 11: Ghost Officer and Jones Omission*

Two separate issues, both independently material. First, an unidentified uniformed officer visible on six BWC angles, arriving in a marked vehicle, interacting with Plaintiff and victim, coordinating officers—never identified in any record. Defense suggested "Howe"—but one view is from Howe's own camera. Second, Jones was present for the entire incident, administered the oath, coached the victim, radioed West, said "map out the PC"—but appears in no CAD log, arrest report, or official record. His BWC was withheld from criminal discovery. The Axon audit trail reveals a further dimension: Jones's 0226 initial-arrival video was left in a generic unlinked bucket while Lawrence's corresponding same-time video was linked to the domestic incident. Jones also has solo uploads at 5:09 AM and 5:39 AM during the post-arrest report-assembly window with no matching Lawrence videos. This is not just a "ghost officer" problem. It is a concrete evidence-linking asymmetry: the officer whose camera captured the most incriminating footage had his evidence systematically unlinked from the incident while the arresting officer's corresponding footage was linked. These are not the same issue and both preclude summary judgment.

### *Point 12: Post-Arrest Document Assembly*

No complete contemporaneous arrest packet existed at booking. The incident report was created at 6:42 AM. The charge was initiated at 9:23 AM. Lawrence signed at 3:47 PM. SN 1400 printed it April 14, 2025—one day after the demand letter. The packet jumps from page 2 to page 11. The affidavit has blank supervisor line, blank comments, unclear affiant, no judicial execution block. Template markers: "Traffic" charge type on a domestic call, "PATR" designation, "by persons unknown to me" in a known-parties case. Plaintiff's SSN and driver ID appear despite presenting only a passport. This is post-hoc assembly.

***Point 13: Jones BWC Withheld—Brady***

Jones's camera captured the debrief admission, coaching angle, charge nod, radio to West, documentation uncertainty, and "bullshit report." The public defender never saw it. Jones appears in no official record. The same documentation pattern that erased him from paperwork kept his camera out of criminal discovery. Brady v. Maryland, 373 U.S. 83 (1963). Defendants characterize Jones as passive. The footage proves otherwise.

***Point 14: Twelve Discovery Contradictions***

| # | ISSUE | CONTRADICTION |
|---|-------|---------------|
| 1 | Huggard present then withdrawn | Sworn: on scene. Huggard: never there. Alexander confirmed. No correction. |
| 2 | Jones role appeared later | Oct. 30: "Bradford" no role. Nov. 3: FTO. Non-CAD inclusion, ghost officer excluded by both methods. |
| 3 | List "complete" despite ghost officer | Feb. 16: complete. Officer on 6 BWC angles still unidentified. |
| 4 | Metadata denied, confirmed by 30(b)(6) | Nov. 3: no logs. Goldstein: system maintains all categories. |
| 5 | Audit trails never addressed | Nov. 3: video only. Source records unaddressed despite confirmed existence. |
| 6 | CAD: face sheet only | Not audit trail. Dual Bush entries, West 15-min gap unresolved. |
| 7 | RMS: never produced, SN 1400 unknown | No production. Goldstein: Ubi administers. Cannot identify SN 1400. |
| 8 | Aja vs. Cason | Version 1: Aja/report. Version 2: Cason/arrest. Changed both. No explanation. |
| 9 | West: CAD 2:49 vs. BWC 2:34 | Defendants: CAD is "best." BWC: West there 15 min earlier. |
| 10 | Lopez false certification | "All employed." Lopez separated. False when signed. |
| 11 | RFAs six months late | Oct. 1 served. ~March 19 response. Bare denials. Ambiguities uncured. |
| 12 | Stoppage denied, TAC debrief confirmed | Nov. 3: no logs. Goldstein: tracking exists AND TAC debrief official policy. |

***Point 15: MSJ Filed While Defaulting on Discovery***

February 25, 2026: 12 RFPs and 7 interrogatories served across 7 sections. Due March 27—same day as MSJ filing. Zero formal responses. No request-by-request response. No Rule 34(b)(2) objections. No Rule 33(b)(5) verification. Defense counsel's informal email is not a discovery response.

***Point 16: Axon Audit Trail***

Lawrence: Evidence.com logins at 2:56 and 3:14 AM during the active incident, no object-level records showing what was accessed; citizen audio request at 6:49 AM for "AUDIO" on the incident; "New Recording 3.m4a" uploaded at 8:51 AM via citizen portal, tagged

AXONCitizen—never produced. Bush: logged in at 3:20 AM from a different IP address than other officers, MFA noted, different browser version; victim injury photos captured at 2:49–2:50 AM per audit trail even though the arrest narrative uses later timing; arrest photos uploaded at 3:21 AM with 2125 retention dates (100 years) while other evidence in the same session received standard 2033 retention; duplicate preservation actions across incidents 013074 and 013072. Howe: zero audit records—earliest continuous BWC, performed initial detention, no access history, no chain of custody. West: only three auto-generated BWC entries, zero logins, zero evidence-access activity on the date of arrest despite later testimony that he reviewed all files— the commanding officer has the thinnest audit footprint of any named defendant. Cason: zero BWC entries for the incident despite 3+ hours on scene as supervising sergeant, yet repeated late-night buffered review activity on an unrelated February 28 file ("36-FIGHT")—unexplained related-file review while producing nothing for the incident he supervised.

*Point 17: Conflicting Interrogatory Versions*

Oct. 30: "Report approved by Sgt. Aja." Nov. 3: "Cason approved the decision to arrest." Changed the approver AND what was approved. No Rule 26(e) notice. Both signed by Risk Manager Mason. Defendants' MSJ mentions Cason but not Aja, not the conflict, not the change.

*Point 18: Four False Certifications*

| # | CERTIFICATION | WHY FALSE |
|---|---|---|
| 1 | Metadata denial (Nov. 3) | Goldstein confirmed system maintains all categories denied. |
| 2 | Lopez employment (Nov. 3) | "All employed." Lopez separated. False when signed. |
| 3 | Huggard presence (Oct./Nov.) | Both said on scene. Huggard: never there. Alexander confirmed. |
| 4 | Howe audit trail (Mar. 27) | "See logs produced." No Howe logs exist. Facially false. |

*Point 19: The Racial Slur Gambit*

Defendants include Plaintiff's unwitnessed racial epithets (DE 75, ¶¶19, 27–29)—immaterial to any element. But "unwitnessed" cuts both ways: if officers couldn't hear the epithets, they couldn't hear handcuff complaints. The extended unmonitored periods confirm Plaintiff's custody-conditions account.

*Point 20: CAD/Communications-Chain Defects*

CAD created at 02:20:44. Call source: "O-NON 911 CALL." Intake fields blank: caller city, caller location, ANI/ALI received, phone pickup. Creator identity: "SMITH, LOGAN / COMMBS20105" but discovery identifies Corrianne Delancy and Roselynne De Leon. No complete communications chain showing who received, transferred, entered, modified, or classified the call. The "clean dispatch narrative" Defendants rely on is itself unverified.

## V. THE AB4 TRAINING DECK: NOT A SIMPLE CAMERA—A CONFIGURED MUNICIPAL SYSTEM

Defendants' own Sunrise Police Department AB4 training materials, produced March 27, 2026, establish that the BWC system was a centrally configured municipal evidence platform. The deck is not a generic product manual—it is an agency-customized instructional document reflecting what Sunrise chose to train, what capabilities the department knew existed, and what settings the department controlled. The deck instructs presenters to remove slides that do not represent "the agency's preference," confirming the training content was curated to reflect official departmental policy.

The deck establishes the following agency-trained capabilities, each relevant to the disputed evidence in this case:

| # | CAPABILITY | WHAT IT PROVES |
|---|---|---|

| 1 | Stealth Mode | Suppresses LEDs, audio prompts, haptic feedback. Camera operates with zero external indicators. Contradicts any claim subjects "would always know." |
|---|---|---|
| 2 | Mute Mode (Mic Off) | Distinct LCD state. Contradicts any blanket testimony that cameras "cannot be muted." |
| 3 | Configurable Buffer | Agency sets duration: none, 30, 60, 90, or 120 seconds. Buffer is a municipal policy choice. |
| 4 | Configurable Stop/End | How officers terminate recordings is agency-controlled. Not neutral device behavior. |
| 5 | Signal-Triggered Recording | Holster/vehicle/TASER auto-start. If not enabled: why did Sunrise choose not to use available safeguards? |
| 6 | False Signal Dismissal | Officers can override automated triggers and return to buffer. Demands: signal/dismissal logs. |
| 7 | Manual Metadata Entry | Case number, title, category, retention—user-entered via Axon View/Capture/View XL. Not self-proving. |
| 8 | Grouped-Video Separation | 60-second rule. Evidence can be regrouped, relabeled, differently classified within the platform. |
| 9 | Direct Camera Upload | Programmable button. Priority upload. No dock required. "Had to wait for docking" is false. |
| 10 | Tablet (Axon View) | Replay, live preview, metadata entry, settings changes, separate evidence creation. Not just a viewer. |
| 11 | GPS/Location Services | Embedded GPS, LTE, WiFi. Location services agency-configurable. GPS data exists or was suppressed by choice. |
| 12 | Policy Integration | Chapter 14 referenced directly. Official training linked to formal written policy through Evidence.com. |

This training deck independently defeats five positions Defendants have taken: (1) that "see logs produced" satisfies metadata/hash/activation requests—the deck proves these are separate categories; (2) that AVL/GPS is exempt—the deck shows embedded GPS with agency settings, not tactical deployment data; (3) that metadata is system-generated—the deck shows manual entry; (4) that the camera is a simple recording device—the deck shows a 28-capability managed platform; and (5) that the Howe audit trail was "produced"—no Howe records exist.

## VI. CONSOLIDATED SOURCE-RECORD CATEGORIES THE TRAINING DECK MAKES UNAVOIDABLE

Defendants' own training materials establish that the following source-record categories exist as separate, distinct data sources—none satisfied by user audit trail PDFs: (1) agency AB4 settings in effect March 6, 2025; (2) pre-event buffer configuration; (3) stop/end recording configuration; (4) GPS/location service settings and logs; (5) Signal-trigger configuration; (6) LED/speaker/haptic/stealth settings per device; (7) programmable button configurations; (8) full admin settings and permissions; (9) firmware/settings update history; (10) activation/deactivation/mute/stealth event logs; (11) Signal and false-Signal logs; (12) upload logs showing source device, time, method; (13) metadata edit trail showing who entered/changed title/ID/category/retention; (14) grouped-video separation logs; (15) Axon View/View XL session logs; (16) Axon Capture creation logs; (17) GPS for all active BWCs; (18) native files and hash values; (19) export/download history; (20) camera assignment records; and (21) Chapter 14 full policy and revisions.

## VII. RULE 56(d)—SUMMARY JUDGMENT MUST BE DEFERRED

Rule 56(d) provides that when a nonmovant shows it cannot present facts essential to justify its opposition, the court may defer, deny, allow discovery, or issue any appropriate order. Plaintiff cannot fully oppose this Motion because Defendants are actively withholding source records needed to test the evidence they rely on:

• **Native BWC metadata, hash values, and activation/deactivation logs** confirmed by Goldstein to exist. Never produced. Go to integrity of BWC evidence cited as foundation for probable cause.

• **CAD audit trail** never produced. Only face sheet. Needed to test West 2:34/2:49 contradiction and dual Bush entries.

• **RMS creation/modification logs** never produced. Needed to determine when report created, who modified it, who SN 1400 is.

• **Citizen audio file "New Recording 3.m4a"** audit trail confirms existence. Never produced.

• **12 RFPs and 7 interrogatories** served Feb. 25, 2026. Zero formal responses as of MSJ filing date.

• **AVL/GPS vehicle location data** refused on inapplicable Florida public records exemption. Training deck confirms embedded GPS.

• **Station surveillance** not produced. 3:13–5:21 AM custody window undocumented.

• **21 source-record categories** established by Defendants' own training deck as separate data sources. None produced.

Defendants cannot obstruct discovery and seek judgment on the incomplete record. The Court should defer ruling until these categories are produced and reviewed.

## VIII. MUNICIPAL KNOWLEDGE AND CENTRALIZED CONTROL

The City's relationship to these systems is not incidental. Sunrise voluntarily adopted and relied on Broward's regional communications and CAD structure as part of its official dispatch operations. It maintained integration, participated in governance, and continued relying on the system as the official source of dispatch timing and officer status. Alexander's assertion that CAD and RMS records are possessed by "BSO" does not relieve the City of its discovery obligations for records it has the practical ability to obtain from systems it accesses daily. Rule 34 "possession, custody, or control" includes records a party can obtain through its ordinary relationship with the system administrator.

By June 2025, the City had received Plaintiff's federal lawsuit, Risk Manager Mason's department was handling it, outside counsel had been engaged, and City legal and executive actors were simultaneously participating in related police-adjacent governance. Pension board materials independently confirm centralized City awareness. The City cannot plausibly portray these systems as external, fragmented, or beyond municipal knowledge and influence.

## IX. PLAINTIFF'S SUPPLEMENTAL DECLARATION UNDER 28 U.S.C. § 1746

Plaintiff submits and incorporates by reference his separately filed Declaration in Opposition to Defendants' Motion for Summary Judgment, executed under penalty of perjury pursuant to 28 U.S.C. § 1746. That Declaration sets forth Plaintiff's personal knowledge of the events of March 6, 2025, including the circumstances of his detention, arrest, and custody, and the damages resulting therefrom. Plaintiff further declares under penalty of perjury that the factual assertions in this opposition, including the BWC reconstruction in Section III, are true and correct based on his personal knowledge and his frame-by-frame review of body-worn camera footage produced by Defendants.

## X. CONCLUSION AND RELIEF REQUESTED

Defendants' Motion asks this Court to accept a sanitized version of events built on one officer's declaration while ignoring the deposition testimony of four witnesses, a manufactured probable cause sequence across three cameras, twelve contradicted discovery responses, an unidentified officer on six cameras, an audit trail showing unexplained evidence handling, a complete default on supplemental discovery, four false certifications, a training deck establishing a 28-capability municipal evidence platform they refuse to examine, and a real-world custody timeline showing three hours of detention before a document existed.

Plaintiff respectfully requests that this Court:

**1.** Deny Defendants' Motion for Summary Judgment on all counts;

**2.** Find that genuine disputes of material fact preclude summary judgment and that these claims shall proceed to trial;

**3.** Find that qualified immunity does not shield any Defendant;

**4.** Defer ruling under Rule 56(d) until the withheld source records are produced;

**5.** Grant such other relief as the Court deems just.

Dated: March 27, 2026

*Respectfully submitted,*

**/s/ Nihal Michael Gautam**

**NIHAL MICHAEL GAUTAM, Plaintiff Pro Se**

840 SW 6th Street, Hallandale, FL 33009

954-489-8883 | nihalg5555@gmail.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on March 27, 2026, a true and correct copy of the foregoing was served upon counsel for Defendants, Scott David Alexander, Johnson, Anselmo, Murdoch, Burke, Piper & Hochman, P.A., 2455 E. Sunrise Boulevard, Suite 1000, Fort Lauderdale, FL 33304, via U.S. Mail and electronic mail at alexander@jambg.com.

/s/ Nihal Michael Gautam